FILED

AUG 0 1 2017

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____
                DEPUTY

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

RAYMOND TELLEZ,

    Plaintiff,

v.

THE GEO GROUP INC.,

    Defendant.

Case No: 5:15-cv-465-RCL

## MEMORANDUM OPINION

Plaintiff Raymond Tellez, formerly an inmate at the Central Texas Detention Facility, brings this negligence action against defendant The GEO Group, Inc. ("GEO"),[1] which operates the Central Texas Detention Facility, in connection with a stabbing assault perpetrated by other inmates that he suffered while an inmate at the Central Texas Detention Facility. Mr. Tellez originally brought claims for negligent supervision (of inmates), lack of supervision or training (guards), and negligent implementation of security policies or procedures. On February 9, 2016, Magistrate Judge Primomo recommended that summary judgment be granted in favor of defendant as to Mr. Tellez's negligent training and supervision claims [ECF No. 30]. He recommended that summary judgment be denied, however, with respect to Mr. Tellez's claims regarding failure to implement security policies or procedures. On August 15, 2016, Judge Biery adopted this Report and Recommendation and granted summary judgment in favor of defendant as to Mr. Tellez's

---

[1] Plaintiff, acting pro se, originally brought suit against The GEO Group, Inc., GEO, GEO Group Facility, and Central Detention Facility. As noted at trial, the appropriate defendant is The GEO Group, Inc.

1

negligent training and supervision claims and denied summary judgment as to Mr. Tellez's claim concerning negligent implementation of a policy/regulation [ECF No. 46].

This case was tried to the Court on January 4, 2017. The Court has considered the evidence presented at trial, the parties' proffered facts, the arguments of counsel, and the controlling legal authority. The Court has also ascertained the credibility of each witness and evaluated the probative value of all relevant evidence admitted at trial. Based upon the foregoing, the Court makes the following findings of fact and conclusions of law. It concludes that defendant The GEO Group was negligent in failing to implement several policies and is therefore liable to Mr. Tellez. The Court will award damages totaling $25,000.

## I. FINDINGS OF FACT

Defendant the GEO Group, Inc. operates the Central Texas Detention Facility. Mr. Tellez is an inmate who, in October 2013, was incarcerated at the Central Texas Detention Facility while awaiting sentencing. He had been arrested and charged with intent to distribute a controlled substance (cocaine) and possession of a firearm by a convicted felon on May 17, 2013. Several months later, his drug charge was changed from cocaine to methamphetamine and he was charged under a superseding indictment. On June 1, 2016, he was charged in a one count information with participating in a racketeer influenced and corrupt organization ("RICO") conspiracy. The pattern of racketeering activity included four murders, extortion, and the distribution of narcotics. Mr. Tellez agreed to plead guilty to these charges, but has not yet been sentenced.

Prior to his incarceration, Mr. Tellez was a "general" in the Texas Mexican Mafia. As such, he was the highest ranking member in San Antonio, with approximately 4,000 individuals under his command. While incarcerated, Mr. Tellez began cooperating with the government, becoming a confidential informant against the Mafia. He has testified against several members of

the Mafia, resulting in their incarceration, and, at the time of trial, was expected to testify against two more. The Mafia's penalty for this cooperation is death. Thus, all 4,000 of the Mafia members previously under Mr. Tellez's command were essentially instructed to kill him.

This placed him at a higher risk of being assaulted by other inmates. As a result, he was kept in protective custody, with instructions to keep him away from all other inmates. Mr. Tellez was thus held in a cell on the first floor in the medical department. The medical department consists generally of three areas: 1) the main medical area/waiting area; 2) medical left; and 3) medical right. Medical left—the female side—consists of eight cells, a guard's desk, and a shower area. Medical right—the male side—consists of three cells and a shower area. The main medical area/waiting area contains a guard's desk. The three areas are oriented as follows: if one enters the medical department, they will be standing in the main medical area/waiting area, facing the guard's desk in the center. The entrance to medical left is to the left of the guard's desk. The entrance to medical right is to the right of the guard's desk. Both are along the same wall behind the guard's desk. Medical left and medical right are separated from the main medical area by locked doors. Mr. Tellez was held in Cell 2 in medical right. The shower area was located across from him.

On October 24, 2013, two other inmates—Roland Contreras and Randy Gonzales—were transported to the medical area. Inmates Contreras and Gonzales are members of the Mexican Mafia, who, like other members of the Mexican Mafia, sought to punish Mr. Tellez for his cooperation. Due to this affiliation, they were housed in administrative segregation—separate from the general population—and were considered threats to other inmates. Because of their status as inmates housed in administrative segregation, according to GEO policy at the time of the assault, inmates Contreras and Gonzales were supposed to be strip searched before being transported out

3

of their cells. GEO Officer Victoriono Chavarria was responsible for conducting the strip search. They were not strip searched on October 24, 2013. They were also supposed to be pat searched upon arriving at the medical department. Officer Dianne Corona was responsible for conducting the pat search. They were not pat searched on October 24, 2013.

Once in the medical area, inmate Contreras' restraints were partially removed by Nurse Mary Garcia for a foot soak treatment, so that at least one hand was free and uncuffed. This was contrary to GEO policy, under which inmates Contreras and Gonzales were supposed to have been restrained by leg and hand restraints. Nurse Garcia had been instructed on previous occasions that restraints were not to be removed from inmates kept in administrative segregation—such as inmates Contreras and Gonzales—without a doctor's order and authorization from the duty warden.

On the evening of October 24, 2013, GEO Officer Candace Lundquist was on duty in the medical department. She was responsible for the main medical area, medical left, and medical right. During and around the time of the assault at issue, she was moving amongst the three areas, sometimes leaving the guard's desk in the main medical area unattended.

Around 6:30 p.m., sometime after inmate Contreras' restraints were removed, and while Officer Lundquist was in medical left—and therefore was absent from the main medical area where inmates Contreras and Gonzales were located—inmates Contreras and Gonzales got up, and walked through the door separating the main medical area from medical right, where Mr. Tellez was being housed. According to GEO policy, these doors were supposed to be kept locked. On the evening of October 24, 2013, however, they were not locked. This fact was known to GEO employees. At the time, Mr. Tellez was in the shower. He was attacked by inmates Contreras and Gonzales. Inmate Contreras stabbed Mr. Tellez with a sharpened object, *i.e.*, a shank, while inmate

4

Gonzales acted as a lookout. Mr. Tellez was stabbed several times and suffered several stab wounds and abrasions. He suffered from puncture wounds to the right chest, right armpit, right rib cage, right front leg, right lumbar, and rear right leg. He suffered abrasions to the top of his head, neck, right lumbar, and rear right leg.

After the assault, Mr. Tellez was placed in his cell where an initial assessment was conducted by Nurse Garcia. Forty-five minutes later, he was taken to an assessment room for evaluation. Mr. Tellez was able to walk to these locations. His wounds were checked and cleaned, but he was not given any pain medication. Dr. Samuel Morgan, the facility physician, recommended that due the nature of Mr. Tellez's injuries and the lack of ability to assess the extent and severity of his injuries, Mr. Tellez be transferred off site for further assessment, but that there was no need for an ambulance because Mr. Tellez's injuries were not life threatening. Mr. Tellez was transported to the hospital by facility vehicle around 8:00 p.m. He waited for approximately one hour at the hospital before receiving treatment. Three of his stab wounds were closed with staples and he was placed on pain medicine for five days. Mr. Tellez was transported back to the jail and arrived at approximately 3:30 a.m. on October 25. The same day Mr. Tellez arrived back at GEO from the hospital—October 25, 2013, the day after the attack—he was transferred to Guadalupe County Jail, where he was housed in the medical department for two weeks.

After conducting an investigation, GEO issued a report finding that Officers Chavarria and Lundquist committed acts of gross negligence in not following facility procedure. Officers Chavarria and Lundquist and Nurse Garcia were terminated as a result of this incident.

## II. CONCLUSIONS OF LAW

### A. Legal Standards

The elements of a negligence claim are 1) the existence of a duty, 2) a breach of that duty, 3) proximate cause, and 4) damages. *IHS Cedars Treatment Ctr. of DeSoto, Texas, Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004). As a general rule, "there is no duty to control the conduct of third parties." *Salazar v. Collins*, 255 S.W.3d 191, 198 (Tex. App. 2008). An exception applies, however, "when a special relationship exists between an actor and another that imposes a duty on the actor to control the other's conduct." *Id.* At least one Texas Court of Appeals has determined that prisons and jails have a special relationship with inmates in their custody which imposes on them a duty to protect inmates from other inmates in certain circumstances. *See id.* at 198–203. Specifically, prisons "owe a duty of reasonable care to protect inmates from harm [at the hands of other inmates] when that harm is reasonably foreseeable." *Id.* at 203; *see also Minneci v. Pollard*, 565 U.S. 118, 128 (2012) (citing *Salazar* as "specific authority indicating that state law imposes general tort duties of reasonable care (including medical care) on prison employees in every one of the eight States where privately managed secure federal facilities are currently located"); *Doe v. The Geo Grp., Inc.*, No. SA-16-CV-173-XR, 2017 WL 835209, at *5 (W.D. Tex. Mar. 2, 2017) (citing *Salazar* and stating "Texas law might impose a duty of care on prison staff").

The element of proximate causation has two sub-elements: cause in fact and foreseeability. *IHS Cedars Treatment Ctr.*, 143 S.W.3d at 798 "Cause in fact is established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred." *Id.* at 799. "Foreseeability exists when 'the actor as a person of ordinary intelligence should have anticipated the dangers his negligent act creates for others.'" *Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002).

## B. Analysis

The Court finds that Mr. Tellez has demonstrated all of the elements of a negligence claim.

### 1. Duty

First, GEO owed Mr. Tellez a duty to protect him from attack in these circumstances. GEO knew that as a government cooperator working against the Mexican Mafia, Mr. Tellez was in danger of being attacked. Mr. Tellez was thus to be kept in protective custody away from all other inmates. The inmates who attacked Mr. Tellez were members of the Mexican Mafia who were considered to be threats to other inmates. As such, they were kept in administrative segregation. Based on these facts, the Court concludes that under *Salazar*, harm to Mr. Tellez was reasonably foreseeable.

### 2. Breach

The Court next finds that GEO breached that duty. GEO policy states the following with respect to strip searches of inmates in administrative segregation:

> Upon arriving at the designated cell [the officer] will direct the detainee to stand and remove his/her clothing for a strip search. The detainee will hand his/her clothing though his/her cell to [the officer], which [the officer will physically inspect for contraband. [The officer] will hand the clothing back to the detainee and watch the detainee get dressed. [The officer will] [n]ever take [his/her] eyes off of the detainee during this process because the detainee inside the cell may secure a weapon or other contraband while [the officer] avert[s] [his/her] supervision. There will be no multiple clothing or double/triple layers of clothing on the detainee when released from his/her cell. [The officer will] [h]ave the detainee follow proper strip search procedures before returning the clothing or applying restraints.

Pl.'s Trial Ex. 1 ¶ 5. GEO Warden Barry testified that inmates Contreras and Gonzales should have been strip searched before they reached the area where Mr. Tellez was being housed.

GEO policy states the following with respect to pat searches:

Detainees <u>must</u> be pat searched before entering into or departing from the Medical area. . . . All detainees are to be pat searched when entering or leaving the Medical Department. NO EXCEPTIONS! Although the Housing Unit Officer may have searched the detainee, you are responsible for searching detainees entering or leaving the Medical Department.

7

Pl.'s Trial Ex. 2 at 1, 8. Warden Barry testified that inmates Contreras and Gonzales should have been pat searched before they reached the area where Mr. Tellez was being housed.

GEO policy states the following with respect to restraints for inmates in administrative segregation:

> When the detainee is dressed, [the officer] will have the detainee turn around with [his/her] back to you, place the waist chain on him/her. After placing the waist chain on the detainee, [the officer] will apply the handcuffs to them in the front of their body. [The officer] will then have the detainee turn around again and place the leg-irons on them. All restraints will be locked prior to the detainee coming out of the cell.

Pl.'s Trial Ex. 1 ¶ 6. Warden Barry testified that inmates Contreras and Gonzales should have been restrained by both leg restraints and hand restraints at the time of the attack. He also testified that Nurse Garcia had been instructed on previous occasions that restraints were not to be removed from inmates in administrative segregation—such as inmates Contreras and Gonzales—without a doctor's order and authorization from the duty warden.

GEO policy states the following with respect to the locking of the medical doors: "At times, the Medical staff shall, out of necessity, leave a room. At such time, they have been directed to lock that space by locking the door. You are directed to verify that they have done so." Pl.'s Trial Ex. 2 at 2. Warden Barry testified that the doors to medical right—where Mr. Tellez was being housed—were supposed to have been locked at the time of the attack.

On the day of the attack, *none* of these policies were followed. Inmates Contreras and Gonzales were not strip searched. They were not pat searched. Inmate Contreras' restraints were partially removed. The doors to medical right were left unlocked while Officer Lundquist left the main medical area and entered medical left. Such failure to implement policies was a breach of GEO's duty to prevent harm to Mr. Tellez.

8

### 3. Damages

Mr. Tellez suffered damages. The Court will quantify his monetary damages in Part III, *infra*, but it is sufficient to state here that he suffered from several stab wounds, three of which needed to be closed by staples, as well as several abrasions.

### 4. Causation

GEO's breach was the proximate cause of Mr. Tellez's injuries. Even though inmate Contreras actually inflicted the injuries on Mr. Tellez, GEO's failure to implement the above described policies was the cause in fact of Mr. Tellez's injuries because these failures were substantial factors in bringing about the injuries. Inmates Contreras and Gonzales were not strip searched before leaving their cells. If they had been, guards would have found the shank tucked into the waistband of inmate Contreras. They were not pat searched upon arriving at the medical department. Again, if they had been, guards would have found the shank. Inmate Contreras' shackles were partially removed by Nurse Garcia. If he had remained shackled as required by GEO policy, he would not have been able to retrieve the shank from his waistband and use it to stab Mr. Tellez. Finally, the doors to medical right were unlocked. This allowed inmates Contreras and Gonzales to enter the area containing Mr. Tellez, even though he was supposed to be kept away from all other inmates. If any one of these policies had been followed, the attack would not have occurred as it did. Warden Barry even testified that the assault was a result of a failure by the GEO Group to strip search or pat search inmates Contreras and Gonzales, properly restrain them, monitor them, and lock the doors to Mr. Tellez's cell area.

The element of foreseeability is also present. Inmates Contreras and Gonzales were known to be dangerous inmates. Mr. Tellez was known to be at risk of harm at the hands of other inmates. GEO should have anticipated that not searching and unshackling a dangerous inmate—who was a

member of the same organization that Mr. Tellez was actively testifying against—in the area where Mr. Tellez was being held, and then leaving the only door separating Mr. Tellez from said dangerous inmate unlocked, could lead to harm to Mr. Tellez.

Thus, having demonstrated all the elements of a negligence cause of action, the Court concludes that judgment shall be entered in favor of Mr. Tellez. GEO is liable for any damages that Mr. Tellez suffered, which are addressed in the following section.

## III. DAMAGES

Mr. Tellez seeks the following in damages: $75,000 for physical pain sustained in the past; $50,000 for physical pain which in reasonable probability he will sustain in the future; $100,000 for mental anguish sustained in the past; $50,000 for mental pain which in reasonable probability he will sustain in the future; $50,000 for physical impairment sustained in the past; $50,000 for physical impairment which in reasonable probability he will sustain in the future; $50,000 for past disfigurement; and $50,000 for future disfigurement. The Court takes each in turn.

### A. Physical Pain

Plaintiffs may recover economic or noneconomic damages. Noneconomic damages include "damages awarded for the purpose of compensating a claimant for physical pain and suffering." Tex. Civ. Prac. & Rem. Code Ann. § 41.001(12). As described above, Mr. Tellez suffered from several stab wounds and abrasions, which he described as painful. Mr. Tellez testified that at the time of the attack, his pain level was a 10 on a scale of 1 to 10. The worst pain was the result of the stab wounds to his upper right shoulder and to his right thigh.

Mr. Tellez was evaluated by GEO staff following the attack, who found that he suffered from superficial stab wounds, but no intrathoracic traumatic injuries, no acute traumatic injuries to the abdomen or pelvis, no acute cardiopulmonary abnormalities, and no significant

abnormalities in the chest wall. Mr. Tellez was observed as oriented and was in no apparent distress. Mr. Tellez testified that there was no discussion of physical pain while he was at GEO before he was transported to the hospital.

After Mr. Tellez arrived at the hospital, he rated his pain as a 3 out of 10.[2] He was described as alert, oriented, and in no apparent distress. He was able to take deep breaths without pain. Mr. Tellez was given pain medication shortly after midnight. He was treated with staples to three of the stab wounds, was given prescriptions for ibuprofen and hydrocodone, and was discharged as stable. Dr. Morgan, the GEO facility physician, ordered that the hydrocodone prescription be discontinued as narcotics are typically not prescribed by the facility doctor and he determined that the ibuprofen prescription would be sufficient for pain. Mr. Tellez was kept on pain medication for five days, but he testified that the medication did not help his pain. Warden Barry visited Mr. Tellez the morning after the attack. Warden Barry testified that Mr. Tellez did not appear to be in distress or pain, and that he spoke in a normal tone of voice.

Mr. Tellez testified that he experienced pain in the months following the attack. He rated this later pain as a 5 or 6 on a scale of 1 to 10. He did not, however, visit the medical department to complain about pain or impairment associated with the injuries sustained in the attack. He did, however, complain about or request to visit the medical department on the following dates for the specified reasons: 1) June 1, 2014 regarding blood work; 2) July 24, 2014 regarding blood work; 3) August 30, 2014 regarding a bite; 4) October 29, 2014 regarding a spider bite; 5) November 2, 2014 regarding a bite; 6) November 30, 2014 regarding a staph infection; 7) February 16, 2015 regarding pain in his ankles; 8) March 3, 2015 regarding a staph infection; 9) August 26, 2015

---

[2] Mr. Tellez testified that at the time he gave this rating, he was under the influence of medication, because if he was not, he would not have rated his pain as only 3 on a scale of 1 through 10. However, this rating was given after Mr. Tellez arrived at the hospital and during his intake, which occurred sometime shortly after 8:00 P.M. According to uncontradicted testimony, Mr. Tellez was not given pain medication until midnight.

11

regarding shoe inserts; 10) September and October 2015 and March 2016 regarding foot pain/inserts for his shoes; and 11) March 7, 2016 regarding a filling in his tooth.

Mr. Tellez testified that he still experiences pain in his right shoulder and right arm—and that he suffers from cramps, that his arm falls asleep, and that he has difficulty lifting heavy objects—but that he does not need pain medication at this point. He also testified that the area where he was stabbed in the ribs bothered him and continues to at times bother him when he rotates his body in a twisting motion. Mr. Tellez's wife testified that he still has sharp pains in his shoulder, although not as frequently as he did after the attack.

The Court does not doubt that being stabbed is a painful experience. It does not, however, find credible all of Mr. Tellez's descriptions of his pain following the attack and in the time that has since passed. The stab wounds that Mr. Tellez received were superficial, and only needed to be closed by staples. No surgery was necessary. According to multiple observations from different parties, Mr. Tellez was not in apparent distress either immediately after the attack or in the morning thereafter. He described his pain as a 3 out of 10 before receiving pain medicine. In the time that has passed since the attack, Mr. Tellez has not complained of or visited the medical department for issues related to injuries sustained in the attack, despite having visited the medical department many other times for issues such as spider bites, staph infections, and foot pain. Mr. Tellez admitted that he no longer needs pain medication. Considering all of this, the Court finds that $75,000 for past physical pain and $50,000 for future physical pain are not warranted. The Court will award $15,000 for past physical pain and $5,000 for future physical pain.

### B. Mental Anguish

Mental anguish is another category of noneconomic damages. Tex. Civ. Prac. & Rem. Code Ann. § 41.001(12). "To recover damages for mental anguish, a plaintiff must introduce

'direct evidence of the nature, duration, and severity of [his or her] mental anguish, thus establishing a substantial disruption in [his or her] daily routine' or evidence of 'a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger.'" *Pendergraft v. Carrillo*, 273 S.W.3d 362, 367 (Tex. App. 2008) (quoting *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995)).

When asked how he felt mentally and emotionally during the attack, Mr. Tellez testified that he was mad and angry because he felt that he should been the one to inflict damage on inmate Contreras, as opposed to the other way around, but that inmate Contreras was not shackled and Mr. Tellez was. He also testified that the attack was frightening, and that he believes he will always have fear. He testified that he had trouble sleeping after the attack—and still has difficulty off and on—and that he experienced nightmares and paranoia. Mr. Tellez also testified that he has experienced fatigue, headaches, loss of appetite, nausea, dizziness, vomiting, hypervigilance, and anxiety. He testified that he thinks about the assault all the time and has had flashbacks.

Mr. Tellez's wife testified that when she saw Mr. Tellez in the days after the attack, he was distraught and very upset, that he was crying and having difficulty expressing himself, and that he was having trouble sleeping. She also testified that now, years after the attack, Mr. Tellez is sleeping better, but that she believes he is still scared.

Again, however, the Court does not find Mr. Tellez's descriptions of the mental anguish he has allegedly suffered to be wholly credible. When asked about the attack, Mr. Tellez's initial response was that it made him angry that it was not a fair fight and that he did not win. It was only after a question from his attorney did Mr. Tellez state that it was frightening. Furthermore, Mr. Tellez testified that he now lives in fear because of the attack perpetrated by two members of the Mexican Mafia as retaliation for his cooperation with the government, but is not scared about the

other approximately 3,998 members of the Mexican Mafia who also would like to see him dead. Finally, if Mr. Tellez is suffering from mental anguish, it may be attributable, at least in part, to other sources. He testified that his involvement in four murders—for which he is awaiting sentencing—has caused him some mental distress. He also testified that he lives in fear for the safety of his wife because the Mafia could potentially harm her in retaliation for his own actions, and he had no ability to help her, a fact that weighs heavily on him.

The Court finds that damages for mental anguish are not warranted here. Mr. Tellez has not introduced evidence showing that he suffered from or currently suffers from such a degree of mental anguish that it substantially disrupts his daily routine. And, although he and his wife testified that the attack was frightening and caused Mr. Tellez to suffer issues such as nightmares, paranoia, and anxiety, the Court finds that this testimony is severely discredited by other testimony presented. Most importantly, first, the testimony from Mr. Tellez indicating that his initial emotional reaction to the attack was not fear or anxiety, but rather anger because he was at a disadvantage—due to his shackles—in a fight he was supposed to win. Second, Mr. Tellez's testimony that he lives in fear due to this attack perpetrated by two members of the Mexican Mafia seeking revenge for his cooperation with the government, but is not at all worried about the other several thousand Mafia members with similar goals. Therefore, considering all of the evidence presented, the Court finds that Mr. Tellez has not demonstrated "a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger." *Pendergraft*, 273 S.W.3d at 367. Thus, the Court will award no damages for mental anguish, either in the past or the future.

### C. Physical Impairment

Physical impairment "encompasses the loss of the injured party's lifestyle, the effect of which must be substantial and extend beyond any pain, suffering, mental anguish, lost wages, or diminished earning capacity." *Pendergraft*, 273 S.W.3d at 367.

Mr. Tellez's wife testified that, shortly after the attack, Mr. Tellez's ability to move his hand was impaired, that he was limping, he was unsteady on his feet, and that he had difficulty remaining seated. She also testified that now, years after the attack, Mr. Tellez is walking better, but still has difficulty holding the telephone due to cramping in his hand and arm. Mr. Tellez testified that he has suffered impairment to his right arm, which falls asleep when he tries to write letters. He also has difficulty lifting heavy objects. After the attack, Mr. Tellez walked with a limp due to the staples in his leg, but no longer suffers from a limp. He also testified that the area where he was stabbed in the ribs bothered him and continues to at times bother him when he rotates his body in a twisting motion. Mr. Tellez does not think he needs any physical rehabilitation.

The Court also finds that damages are not warranted for physical impairment. Based on the above described testimony of Mr. Tellez and his wife, Mr. Tellez's impairment does not go beyond pain—for which he is already receiving damages—and is not so substantial that it affects Mr. Tellez's lifestyle. When asked whether he was impaired from performing his daily routine, Mr. Tellez responded that he may at some point be transferred to a prison where he will no longer be segregated from the rest of population, but admitted that he had no way of knowing whether he would ever be transferred to such a prison which allows ex-gang members to be in the general population. Furthermore, Mr. Tellez admitted that he does not need any sort of physical rehabilitation. The current impairment of to Mr. Tellez's arm—cramping, falling asleep, difficulty

lifting heavy objects—and the former impairment of a limp while he had staples in his leg did not and do not have a substantial effect on his lifestyle to warrant damages for physical impairment.

**D.     Disfigurement**

Damages are available for disfigurement. Disfigurement is "anything that 'impairs the appearance of a person, or that which renders unsightly, misshapen or imperfect, or deforms in some manner.'" *Diamond Offshore Servs. Ltd. v. Williams*, 510 S.W.3d 57, 76 (Tex. App. 2015). Disfigurement damages are available for scarring, even when the scar is located on a part of the body that is usually covered by clothing. *See id.* Damages may be available for future disfigurement, and plaintiffs need not show proof of additional scarring or deformation. *Hopkins Cty. Hosp. Dist. v. Allen*, 760 S.W.2d 341, 344 (Tex. App. 1988). Rather, "recovery for future disfigurement includes recovery for the future embarrassment caused by the disfigurement. Plaintiffs who feel ugly, who hide their disfigurement under clothes and gloves, and who avoid shaking hands, are embarrassed by their scars and may recover future disfigurement damages." *Id.*

Mr. Tellez has three scars as a result of the attack. The first is located on his upper right shoulder and is approximately one half inch long. The second is located on the right side of his ribs and is approximately the size of a thumbnail. The third is located on his right thigh and is approximately one inch long. Because Mr. Tellez has suffered some scarring, he may recover damages for disfigurement. The Court finds, however, that the scarring he suffered does not warrant past disfigurement damages of $50,000. The scars are relatively small and Mr. Tellez has not testified that they are unusually unsightly in color, texture, shape, or otherwise. Therefore, the Court finds that damages of $5,000 are appropriate for past disfigurement. The Court further finds that damages for future disfigurement are not warranted. Mr. Tellez has not testified that he is

embarrassed by the scars, nor has he testified that he feels ugly or feels the need to hide the scars under clothing. Thus, Mr. Tellez's total damages award for disfiguration shall total $5,000.

## IV. CONCLUSION

In accordance with the foregoing, the Court finds that defendant The GEO Group was negligent in failing to implement policies and procedures, and is therefore liable to Mr. Tellez. Mr. Tellez is entitled to $20,000 in damages for physical pain and $5,000 for disfigurement, for a total of $25,000.

A separate Order accompanies this Memorandum Opinion.

Date: July 31, 2017

Royce C. Lamberth
United States District Judge